**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

SONYA HIGHTOWER,

Plaintiff,

**JURY TRIAL DEMANDED**

v.

6:14-cv-541-ORL-28-DAB

JEH JOHNSON, Secretary,
Department of Homeland Security,
Transportation Security Administration,

Defendant.
________________________________________/

## COMPLAINT

COMES NOW Plaintiff, SONYA HIGHTOWER, (hereinafter "Ms. Hightower"), by and through her undersigned counsel, and hereby sues Defendant, JEH JOHNSON, Secretary of the United States Department of Homeland Security and the Transportation Security Administration (Defendant hereinafter referred to as "TSA"), and states as follows:

## INTRODUCTION

1. Ms. Hightower brings this lawsuit after being subjected to illegal actions by the Defendant in violation of Title VII of the Civil Rights Act of 1964, including discrimination based on gender, retaliation, and hostile work environment.

2. The Plaintiff is a resident of Orlando, Florida, and the Defendant is headquartered in Washington, D.C. The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. §1332.

3. Ms. Hightower is an individual female *sui juris*.

4. Venue is appropriate in this Court pursuant to the provisions of 28 U.S.C. §1391.

5. At all times material hereto, Defendant employed the requisite number of employees necessary for legal action to be brought pursuant to the Civil Rights Act of 1964, 42 U.S.C.A. §2000e.

6. Any and all other conditions precedent to the institution and maintenance of this action have been performed or waived, including her exhaustion of administrative remedies.

## FACTUAL ALLEGATIONS

7. Ms. Hightower began working for the TSA in April 2002. She completed FAMS training in August 2002, and was stationed in Orlando, Florida. She rose to the rank of Supervisory Federal Air Marshal (SFAM), while continuing her collateral duties in Recruiting and the Critical Incident Response Team Supervisor. In January 2009, Ms. Hightower was selected as the Assistant Federal Security Director for Law Enforcement (AFSD-LE) for Orlando and Sanford International Airports. This position was a dual reporting position to the FAMS Special Agent in Charge and TSA Federal Security Director. The AFSD-LE position is one of the most senior positions in the FAMS and one of the most prestigious. Orlando Airport is a large Category X Airport with over forty million passengers transiting the airport each year. As the AFSD-LE, Plaintiff was the primary law enforcement profession for all law enforcement coordination throughout the entire airport arena. She was also responsible for a five million dollar law enforcement reimbursement program that included the Orlando Police Department and the Sanford Police Department.

8. Prior to a May 9, 2009 incident, Ms. Hightower enjoyed a very good working relationship with Assistant Special Agent in Charge Charles “Chas” Cook of the Orlando Field Office, Federal Air Marshal Service, who was her immediate supervisor. ASAC Cook recognized that Ms. Hightower was an exemplary SFAM and, as such, ASAC Cook rewarded

her 2008 work performance with a 5% pay increase (which required approval from Headquarters), reassigned her to a Senior Supervisory Position as the Assistant Federal Security Director for Law Enforcement, and supported her entry into a prestigious Master's Degree Program for Senior TSA Employees at the Naval Post Graduate Academy.

9. Once the Complainant was reassigned to AFSD-LE, ASAC Cook continued his support by helping Ms. Hightower develop new security programs at the Orlando Airport, supplying FAM ground base resources to these new programs, and providing positive advice on her new assignment.

10. However, Ms. Hightower's professional relationship with ASAC Cook took a drastic change for the worse in May 2009. In May 2009, Ms. Hightower attended a dinner party that was hosted by an employee of the TSA. ASAC Cook also attended the party and became extremely intoxicated as the evening progressed. At approximately 11:30 p.m., Ms. Hightower was in the kitchen with ASAC Cook and a female guest who attended the party with him when ASAC Cook put both of his hands on his penis and told Ms. Hightower that he had "eight inches of cock" anytime she wanted it. ASAC Cook then put his hands on the back of Ms. Hightower's neck and pulled her forehead into his forehead until they were touching.

11. This grotesque incident was also witnessed by Ms. Hightower's fiancé, who is also a FAM and who clearly saw ASAC Cook grab his groin area and forcefully pull Ms. Hightower by her neck into ASAC Cook's face until she was touching ASAC Cook's forehead. The female subordinate of ASAC Cook who was hosting the dinner party confirmed ASAC Cook's sexual remarks about the size of his penis and how his penis may look small now but when fully erect it was larger. ASAC Cook went on to brag that his penis was six or seven inches in size.

12. Ms. Hightower reported ASAC Cook's completely inappropriate actions and, as a result, ASAC Cook received a Letter of Reprimand which addressed the May 2009 incident in which ASAC Cook's statement about the size of his penis was documented and witnessed by an additional subordinate female employee.

13. Following Ms. Hightower reporting ASAC Cook, he immediately began to discriminate against her in the workplace and created/participated in a hostile work environment. ASAC Cook sexually harassed her, retaliated against her, and treated her different due to her gender, and later her disability. Ms. Hightower performed equal work and did not receive the same pay as her male co-workers. She was retaliated against for complaining about her supervisors' discrimination and continued harassment. The harassment and retaliation was an ongoing pattern of discrimination, harassment, and retaliation by ASAC Cook and certain of his associates.

14. After ASAC Cook sexually harassed Ms. Hightower in May 2009, he began singling her out and speaking to her in a manner that he never spoke to her male coworkers, for example, telling her to "Get your ass in my office now."

15. On May 13, 2009, Ms. Hightower was the victim of an automobile accident while on duty. She was driving a government-owned vehicle when another vehicle struck the rear of the government vehicle which caused an injury to her neck, broke her upper left molar, fractured her sacrum and injured her left jaw. Ms. Hightower was placed on limited duty in June 2009, with ASAC Cook as her direct supervisor. During that time, she was assigned as the Assistant Federal Security Director for Law Enforcement at the Orlando Airport. Ms. Hightower continued to work 50 to 60 hours per week even though she was on limited duty. She was never compensated for this extra time by ASAC Cook. There were four AFSD-LE positions within the

jurisdiction of the Orlando Field Office and Ms. Hightower was the only female AFSD-LE and the only one to receive less pay. The other three AFSD-LEs are white males. Ms. Hightower was also the only AFSD-LE that ASAC Cook made attend weekly staff meetings at the field office. The other three AFSD-LEs were not even required to call in, but Ms. Hightower had to attend in person. Ms. Hightower was also the only AFSD-LE required to directly report to ASAC Cook. The three males reported to the Federal Security Director and coordinated with the SAC. Ms. Hightower found this very unusual and her male counterparts would ask her why he had to do report to ASAC Cook and they did not.

16. In August 2009, after submitting medical documentation regarding her on-duty car accident, Ms. Hightower's supervisor, ASAC Charles Cook, began reading her medical records. Ms. Hightower was aware of this as ASAC Cook called her on the phone to tell her about the content of her private medical records. Ms. Hightower communicated with SAC Bill Reese immediately about ASAC Cook's behavior. SAC Reese took no action at this time. The Administrative SFAM Randy Busch, with ASAC Cook's permission, transferred Ms. Hightower's entire medical file from the FAMS Field Office over to the Orlando Airport. SFAM Busch told Ms. Hightower he did so because she complained to the SAC and if she did not like the way he and Cook handled her medical records then maybe she would be happier if someone else saw her medical reports. Ms. Hightower asked SFAM Busch to please not transfer her medical records, as she was concerned her records would get lost or exposed in the airport and she was not comfortable with the transfer. There had never been a FAM whose medical

rerecords were transferred from the field office to the airport office and there was no need to transfer all of Ms. Hightower's private medical records.[1]

17. In retaliation for Ms. Hightower complaining to SAC Reese, on August 17, 2009, ASAC Cook removed Ms. Hightower from her AFSD-LE duties due to a "medical issue" with FAM Medical. ASAC Cook accused her of calling FAM Medical to make a complaint against him which Ms. Hightower did not do. During their conversation, ASAC Cook was irate and belittled Ms. Hightower on the phone. Ms. Hightower called SAC Reese and advised him of how ASAC Cook had mistreated her and demoralized her on the phone. Ms. Hightower was forced to turn over her AFSD-LE duties immediately without the opportunity to coordinate the projects she had pending. She was sent home for almost three weeks even though FAM Medical cleared her to return to duty after two weeks. ASAC Cook failed to notify Ms. Hightower that she could return to duty after two weeks and instead left her at home for an additional week while she remained under the assumption that she was not medically cleared to return to work. When Ms. Hightower brought this to the SAC's attention, ASAC Cook blamed it on a Security Assistant, Trish Barriga. SA Barriga was "counseled by ASAC Cook and Administrative ATSAC Randy Busch" on her failure to notify Ms. Hightower of being able to return to duty.

18. Ms. Hightower finally returned to limited duty on September 9, 2009. After her return to duty, ASAC Cook began repeatedly calling her to tell her that anyone could do her job, that she was replaceable, and that what she was doing was just not that important in decision-making.

---

[1] There are over 1400 employees at the Orlando Airport and, to this day, Ms. Hightower does not know who has viewed her medical records nor has anyone from TSA advised her that all of her medical records are accounted for, under lock/key, and safe.

19. In another act of the many acts of harassment and retaliation against Ms. Hightower, on December 17, 2009, ASAC Cook ordered Ms. Hightower to take a government vehicle and drive to Miami to the AFSD-LE quarterly meeting. Ms. Hightower had requested to fly as she had a Man Pads Vulnerability Assessment scheduled to attend for the out brief the next day. ASAC Cook refused and told her that she had to drive, so Ms. Hightower drove the 3.5 hours in bad weather. Once she arrived at the meeting, she discovered that all of her male counterparts had the option to fly or drive. Some drove but some flew. Ms. Hightower was understandably upset at the fact that she was being treated differently because of her gender. She spoke with AFSD-LE Greg Mertz during this meeting and reported the unfair treatment by ASAC Cook. She also spoke to several other male supervisors upon her return to the Orlando field office about being treated unfairly and different from the female supervisor. It was obvious to everyone that Ms. Hightower was not being treated the same as her male co-workers.

20. On December 31, 2009, Ms. Hightower had coordinated a 60 person ("VIPR") for New Years' Day at the Capitol One Bowl. ASAC Cook called her in the early afternoon and told her that she could not attend the VIPR as she was on limited duty. Ms. Hightower reminded him that she had been to numerous VIPRs in the past and it was never a problem and that she was not working out of her scope of duties. ASAC Cook said he did not care, that she was not going. Ms. Hightower called the Federal Security Director, who then ordered her to attend and to tell ASAC Cook to call him. This went on for several hours and finally at 7:45 p.m. ASAC Cook called Ms. Hightower and told her to go to the VIPR but to stay in the Command Post. Ms. Hightower told him that she always did. Ms. Hightower felt the hostility over the phone that ASAC Cook had toward her and how difficult he was making it for her to perform her duties. ASAC Cook claimed he was looking out for the Agency due to Ms. Hightower being on limited

duty, however, this was just an excuse, especially considering the fact that he allowed her to work 50 to 60 hours some weeks without compensation. ASAC Cook always used Ms. Hightower's limited duty status to keep her in check or threaten to remove her from her position as AFSD-LE. ASAC Cook used Ms. Hightower's limited duty status as leverage against her and he seemed to take personal pleasure in making Ms. Hightower's ability to carry out her job duties extremely difficult.

21. On January 3, 2010, ASAC Cook called Ms. Hightower at 7:40 p.m. There was a lot of background noise and it sounded like he was calling from a sports bar. ASAC Cook proceeded to berate Ms. Hightower because he had seen her on the news during the VIPR, and accused her of leaving the Command Post. Ms. Hightower explained that she must have been seen during trips to the restroom or while she was going to get something to drink. She told ASAC Cook that she was not taking his harassment anymore. He told her to have a nice night and hung up the phone.

22. On January 08, 2010, Ms. Hightower assisted a FAM in obtaining a parking card for the garage at the Orlando airport. ASAC Cook found out about it and was irate. He hung up on Ms. Hightower in mid conversation while discussing this issue. Ms. Hightower called SAC Reese and told him that she would not continue to be treated unprofessionally by ASAC Cook. SAC Reese advised he did not know what was going on and would call her back. SAC Reese called her back and advised her that there was a serious disagreement and she needed to speak to ASAC Cook and ATSAC Randy Busch immediately. Ms. Hightower was on leave but drove into the office to meet with ASAC Cook and ATSAC Busch in ASAC Cook's office. Both men accused Ms. Hightower of not being a team player and told her that she needed to learn to "stay in her lane." ASAC Cook and ATSAC Busch's verbal attack continued for approximately 45

minutes. Ms. Hightower apologized for causing an issue as that was not her intent, and she knew then she was on her own. Once again, Ms. Hightower felt discriminated against because of her gender.

23. On January 13, 2010, a scandal within the Orlando Field Office known as "the Jeopardy Board" issue broke in the field office. Ms. Hightower went to SAC Reese's office and found he and ASAC Cook looking at the board on SAC Reese's email. Ms. Hightower told SAC Reese the issue at hand was a critical incident and that they needed to move quickly. ASAC Cook responded to Ms. Hightower that she was overacting and exaggerating the issue. ATSAC Busch let out a sigh of disgust when Ms. Hightower spoke and rolled his eyes at her. ASAC Cook then dismissed her with a wave of his hand as if she were a fly. Ms. Hightower left the office and was called back later to discuss the incident with the SAC. Again, she was the only female and all others were males.

24. In January 2010, ASAC Cook ordered Ms. Hightower to attend offensive, discriminatory briefings regarding the Jeopardy Board incident, which gained national media attention that was broadcast on television, in the newspapers, and on the internet. ASAC Cook's offensive briefings were also the subject of inspection by the Department of Homeland Security, Office of Inspector General, in which DHS OIG completed a full report and dedicated page eight specifically to ASAC Cook's inappropriate briefings in Orlando.

25. In February 2010, ASAC Cook completed Ms. Hightower's annual performance evaluation. He advised Ms. Hightower that she was only getting a 1.5 percent pay increase as that was all she deserved. Ms. Hightower advised him that she had worked extremely hard and that a 1.5 percent increase did not reflect the dedication she had shown to the agency. ASAC Cook dismissively advised her that he thought it was fair and that she could take it or leave it.

Ms. Hightower immediately phoned SAC Reese and told him how upset she was. SAC Reese advised he would look into the matter; however, Ms. Hightower never heard back from him on that issue. The male supervisors in the field office received a higher increase than 1.5 percent for much less work than Ms. Hightower had produced. They also received cash awards and time off from ASAC Cook. Ms. Hightower did not. Ms. Hightower reported the disparate treatment to the Federal Security Director John Daly and then Deputy FSD Joe Samuels.

26. In March of 2010, Ms. Hightower was working at the direction of TSA Office of Chief Counsel, Patti Spivey-Wilson, in Mrs. Wilson's government office on a deliberative process case that Ms. Hightower had previously been assigned by Administrative Order of DFSD Joe Samuels. Ms. Hightower was ordered to stop her work with the TSA OCC Patti Spivey-Wilson and to return to the Orlando Field Office. She was under constant surveillance by ASAC Cook and ASAC Cook attempted to interject himself into a deliberative process case. TSA OCC Patti Spivey-Wilson at this point had to contact the Federal Security Director and SAC Reese to stop ASAC Cook from interfering with this sensitive sexual harassment case.

27. On March 17, 2010, after finding out that ASAC Cook and Admin ATSAC Busch were illegally sharing her medical records in the office, Ms. Hightower made a complaint to the SAC. ATSAC Busch had advised Security Assistant Barriga to copy him and ASAC Cook on all of her medical records. Ms. Hightower reviewed a string of emails with attachments to ASAC Cook. Ms. Hightower called OCC Patty Spivey to ask her if this was legal and she advised that it was not. SA Barriga also was counseled again for her mistake for following orders. Ms. Hightower's absolute right to privacy had been violated. No other person on limited duty had this problem.

28. On March 18, 2010, SAC Reese called Ms. Hightower into his office and advised that the office had made a mistake for sending ASAC Cook her medical records and that ASAC Cook advised that he did not read them and that he deleted them each time he received them. Ms. Hightower asked SAC Reese why ATSAC Busch and ASAC Cook had done this if they knew it was improper. He advised it was just a mistake and it had been handled.

29. On March 19, 2010, just two days after making a complaint to SAC Reese about her medical records being released, SAC Reese called Ms. Hightower into his office with ATSAC Busch and advised her that she was transferred from her senior AFSD-LE position to a less senior squad supervisor for her own good, as he did not want to put her in a position to get hurt. Ms. Hightower was devastated and almost speechless. ATSAC Busch looked at Ms. Hightower and grinned. Ms. Hightower asked SAC Reese to please reconsider. SAC Reese told her that the decision had been made. ATSAC Busch then asked Ms. Hightower to step into his office. Once in his office, he told Ms. Hightower that she should be glad they were bringing her back as an ATSAC as they could have made her a Security Assistant or just send her home.

30. After being removed as the AFSD-LE, Ms. Hightower was only given two hours to pack up her entire office, which was located in a separate building. She had to go to a local hardware store to get boxes and pack up the mementos hanging on the wall and desktop. It was extremely humiliating for Ms. Hightower to have to pack up all of the belongings in her AFSD-LE office while several of her subordinates and coworkers passed by her office, as the door was open. They could clearly see the half-packed boxes as Ms. Hightower was forced to remove her personal plaques from the wall. Many of her coworkers inquired about why she was leaving and expressed that she was doing an outstanding job. But Ms. Hightower was under direct orders

from ASAC Cook not to speak about it. ASAC Cook also removed Ms. Hightower's agency vehicle when he was terminated as the AFSD-LE.

31. Ms. Hightower was not afforded the professional opportunity to send an email advising of her reassignment to her counterparts at the airport, which included stakeholders at Delta, Southwest, US Airway, JetBlue, the Orange County Sheriff's Department, the Orlando Police Department, the Federal Bureau of Investigation, the Secret Service, the Alcohol, Tobacco and Firearms (ATF), Customs and Border Patrol, Immigrations and Customs Protection, the Metropolitan Bureau of Investigations and numerous other law enforcement entities in Orange, Seminole, and Volusia County. SAC Reese also did not inform any of her above listed counterparts of Ms. Hightower's removal from AFSD-LE. She was given a direct order by ASAC Cook to stop work on all pending projects as the AFSD-LE and to not send any emails to anyone regarding her removal. Ms. Hightower's work email and work phone were inundated with phone calls and emails with requests for updates on projects and time sensitive internal duties. She was not allowed to respond. Ms. Hightower's abrupt reassignment by SAC Reese hurt Ms. Hightower's professional standing within the AFSD-LE community. Rumors began to circulate that she had been fired or had been disciplined and Ms. Hightower was forced to remain silent and not defend herself, as ASAC Cook ordered her to have no contact with her previous subordinates, coworkers, or counterparts from the Orlando and Sanford Airport. Ms. Hightower was very embarrassed by being removed for making a complaint. She felt helpless as she was being retaliated against even though she had done nothing wrong. Ms. Hightower's character had been injured and her reputation had been and still is tarnished by the removal. She began to experience sleeplessness and fatigue daily. She was diagnosed with migraine headaches and was prescribed medication for her migraines. She was also prescribed medication to address the

insomnia she developed as a result of ASAC Cook's continued discrimination, harassment, and retaliation. Even with the medication, Ms. Hightower often was only able to sleep four to five hours per night.

32. On or about March 22, 2010, ASAC DeCicco wanted Ms. Hightower to sign a limited duty agreement in the field office. Ms. Hightower had never seen this document nor had anyone ever explained it to her. She advised ASAC DeCicco that she had a personal injury case regarding her on-duty injury and would like her personal injury attorney to review the document before she signed it. He agreed. The document allowed Ms. Hightower 14 days to accept or deny the offer. A short time later, ASAC Cook called Ms. Hightower into his office with ASAC DeCicco present and advised her that she could either sign the agreement or go home. Ms. Hightower explained to ASAC Cook that she merely wanted her attorney to review the proposed agreement before she signed it. Ms. Hightower then signed the agreement only because she knew ASAC Cook would send her home if she did not.

33. On March 26, 2010, Ms. Hightower was in the office as a Squad ATSAC for Team 3 and reporting to ASAC Deccio. Office of Chief Counsel, Patty Spivey called her at approximately 9:30 a.m. and asked her to walk across the street to her office at TSA. The office is about 50 yards from the field office. Ms. Spivey and Ms. Hightower were finalizing a Deliberative Process Case from Ms. Hightower's AFSD-LE duties. Ms. Hightower left a hand written note on her door that she was at TSA. At approximately 11:00 a.m., ASAC DeCicco phoned Ms. Hightower to inquire about her location. Ms. Hightower explained that she was at the OCC office with Ms. Spivey. He then advised her that could not leave the FAM's building without checking in with him or ASAC Cook. This was contrary to what was required of the two other male supervisors on limited duty, as they were not required to check in when they left

the building. Ms. Hightower told ASAC DeCicco that she was leaving the OCC and coming back to the FAMS. Upon her return, Ms. Hightower went to ASAC Cook's office where he and DeCicco were waiting for her. ASAC Cook told Ms. Hightower that she could not walk out of the building and that she had no business going to OCC. Ms. Hightower again explained that she was working on a case with Ms. Spivey. ASAC Cook replied that it did not matter. He stated that Ms. Spivey could come to Ms. Hightower's office at the FAMS. OCC Spivey also called during this meeting with ASACs Cook and DeCicco. OCC Spivey was outraged by the way Ms. Hightower was being treated. Ms. Hightower excused herself from the room and went home sick. She was being discriminated against because of her gender and her disability and in retaliation for reporting the prior illegal conduct of ASAC Cook. The two male supervisors on limited duty agreements were allowed to do their jobs, leave the building and perform duties that Ms. Hightower was not allowed to perform. Both of these supervisors confirmed to her that Ms. Hightower was being treated differently. Although ASAC DeCicco was her direct supervisor, ASAC Cook stepped in any time he could find something to harass Ms. Hightower about.

34. On March 29, 2010, OCC Spivey reported to the FAMs office to complete the case she was working on with Ms. Hightower. She was very upset with the situation and spoke to both ASACs about the issue and the way Ms. Hightower was being treated.

35. In April of 2010, Ms. Hightower applied for a Headquarters position as the National Coordinator for the Global Response Team, the AFSD-LE Program and the FAMS Field Training Program. Ms. Hightower was selected for this ASAC position and had a report date of August 2010. Ms. Hightower wanted out of the field office due to the gender discrimination, retaliation, and continued harassment. ASAC Cook berated Ms. Hightower in the hallway of the field office and advised her that she was not to use the title ASAC from her

new position until she reported to Headquarters. He went on to say that Ms. Hightower was not an ASAC and there were only two ASACs in the office and she was not one of them. A short time later, ASAC DeCicco walked into Ms. Hightower's office and told her to remove the ASAC title from her email signature.

36. In May of 2010, Ms. Hightower was still in the Orlando Field Office assigned to Squad Three. During a staff meeting of all male supervisors, ASAC Cook advised all the male supervisors that Ms. Hightower could not be on the Duty Roster to respond to the airport due to her "condition" and that she was assigned to the field office only. Ms. Hightower believed ASAC Cook's comments offensive and unnecessary. Ms. Hightower was once again treated differently because of her gender and her disability. ASAC Cook often referred to Ms. Hightower's "condition" in front of other supervisors and co-workers, even though the implication of the constant use of the word "condition" was deeply offensive to Ms. Hightower.

37. In May 2010, Ms. Hightower was cleared for full duty by her physician and passed two Agency-ordered Functional Capacity Exams, one on June 07, 2010, and the second exam on June 08, 2010. However, FAMS would still not clear Ms. Hightower for full duty. Ms. Hightower was told by ASAC DeCicco in August of 2010 (with her husband in the office as a witness) that she did not resolve her neck injury and the Agency was going to medically disqualify her. Ms. Hightower was shocked after hearing this from ASAC DeCicco. ASAC DeCicco told her to start "burning" her sick leave, as she would otherwise lose it. Ms. Hightower immediately began using sick leave. While out on sick leave, she spoke to her personal surgeon who scheduled her cervical disc fusion. She did not want to lose her job, to include her promotion to the ASAC position, so surgery was the only option at the time to save her position.

38. In July of 2010, DHS OIG reported to the Orlando Field Office to speak with employees about an ongoing internal inspection. ASAC Cook made comments on numerous occasions that people who spoke to OIG were pieces of "shit" and malcontents. ASAC Cook would stand outside Ms. Hightower's office door and make these comments. Ms. Hightower was intimidated by ASAC Cook's comments.

39. On July 23, 2010, ASAC Cook called Ms. Hightower on her day off to advise her that she was clear to go on a house hunting trip to Reston, VA. Ms. Hightower's trip had been on hold due to her medical issue with FAM Medical. Ms. Hightower did not understand why ASAC Cook called her to relay that information because ASAC DeCicco was her supervisor. Ms. Hightower called ASAC DeCicco to ask him what was going on and he seemed upset that ASAC Cook was trying to take over. A few moments later, Ms. Hightower received another phone call from ASAC Cook and he advised he was putting me on speaker with him and ASAC DeCicco. ASAC Cook dominated the conversation that Ms. Hightower was clear to leave for Reston anytime she wanted, that she did not have to come to the field office for anything. This was just the type of atmosphere and hostile environment that ASAC Cook created beginning with the May 2009 incident.

40. Prior to August 11, 2010, there existed a great deal of abuse, bias, harassment, and disharmony all throughout the Orlando Field Office of TSA. There was a great deal of media discussing how bad the office was and how it had no morale. Then someone "blew the whistle" and identified the "Jeopardy Board." Depending upon which national media source one turned to, there is absolutely no question that sex, race, and religion were a part of that Board and that the ASACs would literally spin it and, wherever it landed, that particular person or group of

people were excluded by management level officials from the prime assignments that paid the most money.

41. It was because of all this hoopla that Director Bray and several of his chief assistants and two contract mental health therapists with whom Ms. Hightower confided and still reports attended the meeting. Ms. Hightower asked for an opportunity to speak with the psychologist who accompanied Director Bray. Psychologist met with her and spent quite a period of time. Ms. Hightower related everything that had been occurring in the Orlando Field Office because she was in a mental frame of mind that it was totally unendurable. Ms. Hightower thought that something of a corrective nature would be done by virtue of everything she reported, and it was literally everything that she could think of. Unfortunately, absolutely nothing was done even though Ms. Hightower believes that the psychologist duly reported the information, which is what she said she was going to do, and that information was apparently suppressed.

42. As stated, on August 11, 2010, a meeting was scheduled and conducted by the person who was the top ranking officer and director of the Federal Air Marshal Service. This meeting was scheduled within the context of all that illegal behavior, discrimination, retaliation, and hostile work environment that created an aura of bias, prejudice, fear, and intimidation. The Orlando Field Office was a hotbed of discrimination and it was known nationally throughout all of the many TSA offices, that was allowed to fester by not only management in the Orlando Field Office but by Headquarters in Washington, D.C. The only thing that exposed to a degree the gross bias and prejudice were the media stories about the "Jeopardy Board" which made national news in media of all descriptions – television, radio, the internet, USA Today, and other national newspapers, because of how bad the situation was that existed in Orlando. It was not something that Ms. Hightower was ever considered, thought to have been a participant of,

although she was a supervisor. The "Jeopardy Board" was within a physical area of the facility that Ms. Hightower did not ever have contact with. No one has ever challenged Ms. Hightower's non-involvement. The "Jeopardy Board" had been exposed as a tool that had been used as a means of making choice work assignments available to FAMs in a most discriminatory manner. Without naming names, the Board identified characteristics of people by race, gender, and religion so as, when used, to preclude people in those protected classes from being assigned the better air travel routes while serving as a Federal Air Marshal.

43. At a point during the meeting with all TSA personnel, Director Bray ordered that all people above the rank of Federal Air Marshal leave the room. He expressed the desire to speak candidly with the FAMs without fear of retribution. Accordingly, Ms. Hightower and all ranking FAMs proceeded to leave their seats and depart the room. As she was departing, Ms. Hightower hesitated for a moment to say something to a FAM who would remain in the room. ASAC Cook physically grabbed Ms. Hightower's forearm with his hand squeezing and hurting Ms. Hightower's forearm. This assault was witnessed by Federal Air Marshal Traci Brownlee. ASAC Cook was very upset that all supervisors were ordered to leave the meeting and that the Federal Air Marshals who were in attendance were going to speak to the Director without supervisors in the room. ASAC Cook became irate with Ms. Hightower and another Acting ATSAC Joe Perez. ASAC Cook screamed at Ms. Hightower and Joe Perez, yelling "Leave the room now" in front of the FAMs. After the supervisors left the building where the Director's meeting was being held, the supervisors drove back to the field office in separate vehicles. Upon arriving at the field office, all supervisors met in the conference room. Ms. Hightower was the only female supervisor in the field office and the only female in this particular meeting.

44. As everyone was seated, ASAC Cook looked directly at Ms. Hightower, although he was speaking to everyone in the whole room. ASC Cook screamed allowed that the next time he tells one of the supervisors to leave a room, they had better leave the "fucking room." He went on to state that he "means leave the fucking room now, and to get the fuck out." ASAC Cook said that no one should tell him to "hang on a minute" and that he would not be "undermined" by the supervisors. Ms. Hightower had previously told ASAC Cook to "hang on a minute" when he forcefully grabbed her forearm. So Ms. Hightower knew that ASAC Cook was focusing his tirade directly at her. ASAC Cook went on to call one of the supervisors, ATSAC O'Connell, a "sell out" because ATSAC O'Connell told an African American FAM that ATSAC Randy Busch had called the African American FAM "an Angry Black Man." ASAC Cook then attempted to start a verbal altercation with Ms. Hightower in regards to her telling the same African American FAM that ATSAC Busch had called him a "Confidential Informant." Not once did ASAC Cook address the real issue of inappropriate behavior by ATSAC Busch. His only comments were that people, including Ms. Hightower were "sell outs" for relating that this incident occurred. ATSAC Busch's comments regarding the African American FAM were totally inappropriate; however, ASAC Cook had fostered this type of behavior and had never corrected ATSAC Busch. ASAC Cook stated that it was ATSAC Connell's fault that SAC Reese had been removed, as ATSAC O'Connell should have never said anything about the racial epithet that ATSAC Busch had used to describe the African American FAM.

45. On August 13, 2010, Ms. Hightower reported to SAC Jesse Blanco, who was temporarily assigned to the Orlando Field Office. She reported and complained to SAC Blanco that ASAC Cook inappropriately grabbed her forearm during a meeting. Ms. Hightower also reported to SAC Blanco that she was very upset that ASAC Cook called in FAM Snyder to

discuss the "rumor" surrounding the May 2009 sexual attack incident by ASAC Cook wherein Ms. Hightower was the victim. Ms. Hightower was devastated and this caused irreparable damage to her reputation. From that point forward, her co-workers, colleagues, and subordinates exhibited disdain for Ms. Hightower and life continued to be almost unbearable. Ms. Hightower was targeted because of her gender.

46. Ms. Hightower returned to the Orlando field office on August 19, 2010. She spoke with SAC Blanco and he told her that ASAC Cook had been reassigned from the Orlando Office "for now" and that SAC Blanco would be returning to his office in Detroit very soon. ASAC Cook's reassignment to Washington, D.C. was meant to be viewed and understood by every person as a disciplinary transfer. In point of fact, after a short while, ASAC Cook was given a promotion and a very important position within the FAMS, and the DHS TSA took no prompt, effective, remedial action of a lasting nature to rid the Orlando Office of the sexually-charged hostile work environment because those offenders who still remained were allowed to continue to run rampant in their harassment and mistreatment of Ms. Hightower. Especially true is the fact that Ms. Hightower was personally held responsible for the apparent remedial action against ASAC Cook.

47. Starting September 2010 through April 2011, Ms. Hightower was on medical leave recovering from a cervical disc fusion. In April 2011, her personal surgeon cleared her for full duty once again. Ms. Hightower notified her supervisor, ASAC DeCicco of her surgeon's decision. However, FAM Medical would not permit her to return to work. Ms. Hightower then passed another Agency Order Functional Capacity Exam on May 11, 2011, and on Friday, May 27, 2011. FAM Medical finally cleared her for full duty with no restrictions and SAC Samuels assigned Ms. Hightower to the Operations Division. On Wednesday, June 1, 2011, Ms.

Hightower returned to full duty and was reassigned to the training division. Ms. Hightower genuinely believed that her return to work and reassignment would be a new beginning for her and the Agency, and that all of the discrimination and retaliation she had been subjected to was in the past. Ms. Hightower soon realized that, indeed, nothing had changed.

48. In June 2011, Ms. Hightower's supervisor advised Ms. Hightower that she was not eligible for an In-Position-Increase ("IPI") for her 2010 performance because she had been out on medical leave. Ms. Hightower's supervisor advised her to speak to the Administrative Officer about her IPI. Ms. Hightower attempted to speak to the Administrative Officer and was informed that she was on military leave until mid-2012, Ms. Hightower's supervisor had been well aware of the Administrative Officer's leave when he instructed Ms. Hightower to speak with that Administrative Officer.

49. In August 2011, Ms. Hightower received more nominations than any other supervisor for "Leaders at Every Level." Ms. Hightower was not selected due to her EEO activity and her continued complaints to the Special Agent in Charge regarding her disparate treatment. Males were the only selectees for the "Leaders at Every Level" in the Orlando Field Office for that year.

50. In August 2011, Ms. Hightower's physician placed her from full duty to limited duty. Ms. Hightower's supervisor informed the entire supervisory staff that Ms. Hightower was on limited duty and that he had relieved her of Duty Supervisory responsibilities. However, another female supervisor who was also on limited duty was allowed to continue with Duty Supervisory responsibilities and she had been allowed her to receive holiday and Sunday pay while Ms. Hightower was not allowed to receive that money.

51. In September 2011, Ms. Hightower requested to work on Sunday, September 11, 2011, in recognition of the 10-year anniversary of 9/11. Ms. Hightower's supervisor denied her request and thus denied her the opportunity to participate in recognizing this day with other FAM employees. Ms. Hightower's supervisor told Ms. Hightower that, because she was on limited duty, she was not authorized to work on Sundays. However, another female supervisor who was also on limited duty did work on Sundays, holidays, and she completed Duty SFAM Assignments.

52. In December 2011, Ms. Hightower's supervisor had another supervisor issue a memorandum to Ms. Hightower advising her that she did not meet Medical Standards. Ms. Hightower's supervisor never issued a reason for this memorandum to her. This memorandum was a "Career Ending Action" and a blatant act of gender discrimination and of continued retaliation.

53. In January 2012, Ms. Hightower's supervisor announced in a staff meeting that Ms. Hightower's last day of work with the FAMS would be January 13, 2012. Ms. Hightower was not in attendance at that meeting and she had not been informed that January 13, 2012, would be her last day working with DHS TSA FAM. It was not until after the staff meeting that Ms. Hightower received an email from her supervisor advising her that her Temporary Limited Duty was rescinded and he directed Ms. Hightower to turn in her equipment on January 13, 2012. Ms. Hightower could have worked on limited duty for a year, at a minimum, through October 2012. To this date, neither Ms. Hightower's supervisor nor the SAC have provided Ms. Hightower with the reason they rescinded her limited duty.

54. In February 2012, Ms. Hightower's official FAM employee photograph was stolen off the Orlando Field Office "Y" drive. Ms. Hightower requested a full investigation into

who stole her photograph and released it to Nightline News, which is a major breach of national security and which placed Ms. Hightower in potential physical danger. Nightline News broadcast Ms. Hightower's Official FAM photograph to the public via a news report in February 2012. The SAC and TSA Office of Investigations denied out of hand her request for an investigation. Ms. Hightower's supervisor began speaking openly in numerous briefings with all Orlando federal employees who were associated with DHS and made statements to the effect, "What does she expect us to do, investigate 160 people?"

55. Also in February 2012, the SAC began playing the Nightline News segment, which included Ms. Hightower's stolen photograph to all Orlando and Tampa Field Office employees. The SAC showed this segment in the Orlando Training Room for all Orlando employees to view. The SAC was fully aware of Ms. Hightower's protest of her official photograph being used in a news segment, but he chose to humiliate her in front of all of the Orlando/Tampa employees.

56. Ms. Hightower clearly was subjected to sexual harassment, disparate treatment, retaliation, and a hostile work environment. Furthermore, the facts alleged in this action clearly demonstrate that the triggering point to all of the illegal actions by the TSA was the May 9, 2009, incident. After the May 9, 2009 incident of physical battery and sexual harassment by ASAC Cook, the work environment for Ms. Hightower became depraved. Ms. Hightower's once supportive first line Supervisor, ASAC Cook, then began withholding resources, making berating phone calls to Ms. Hightower before, during and after work hours, mocking her in open staff meetings, holding her to different standards than her male counterparts, denying her attendance at training (while approving all her male counterparts), denying her the option to fly (while approving all her male counterparts to fly), refusing to sign her timesheets (while approving all

her male co-workers), instilling fear that she would be removed from her Senior Supervisory position, then actually removing her from her Senior Supervisory Position twice (without ever notifying Complainant as to the reasons), taking away her assigned work vehicle, removing her from the Critical Incident Response Team (without ever notifying Ms. Hightower as to the reason and assigning a male co-worker with no experience), telling her she was to "Stay in Her Lane" (without ever telling her male co-workers this), failing to notify her she could return to work causing her to use unnecessarily eighty hours of sick leave, showing photographs and videos in staff meetings of women in bikini's and women in bi-sexual encounters, asking the Ms. Hightower if she was bisexual, insinuating that Ms. Hightower was bisexual, staring at the her legs under the table in staff meetings, making sexually suggestive eye contact at her when she wore heels, instructing Ms. Hightower to commit timesheet fraud (which is a terminable offense), denying her attendance at pre-scheduled events (by doing this ASAC Cook tried to make Ms. Hightower look incompetent), accusing her of working outside the scope of her restrictions, accusing her of insubordination, hanging up the phone on her, ordering her to come to work on her scheduled day off (her male co-workers were never ordered to work on days off), requiring her to attend derogatory open briefings about the infamous "Orlando Jeopardy Board", requiring Ms. Hightower to listen to him in open briefings call employees "bottom-feeders" and "pieces of shit", mocking her for relaying information to the Office of Chief Counsel for his offensive Jeopardy Board briefings, denying her attendance at a conference for her duties (then approving attendance for himself and her male co-worker who had no duty responsibilities in the conference), denying her training opportunities in Dallas, Texas (but approving this training for himself and her male co-workers), denying her overtime and premium pay (but approving these for her male co-workers), dismissing her from meetings in front of her male co-workers so that

the "Men" could talk (Ms. Hightower was the only female supervisor in the room), awarding Ms. Hightower a low 1.5 % pay increase for the year 2009 (while giving his friend and a co-discriminator and co-harasser a 3% pay increase, plus $2,500.00), making disparaging remarks directed to her about her use of the Ombudsman Program, attempting to extract information about her from the Ombudsman, making a complaint to Headquarters in regards to the Ombudsman violating her privacy, taunting her to file a complaint regarding her 2009 evaluation, sharing and distributing her personal medical records within the office and outside the office, permanently removing her from her Senior Supervisory Position two days after she complained to her second line supervisor over ASAC Cook sharing her medical records, permanently removing her assigned take home vehicle, mocking Ms. Hightower after she was reassigned, refusing to order his friend and co-discriminator and co-harasser to give her an office key after her reassignment (Ms. Hightower was never issued a key to her office and had to stand in the hallway for subordinates to view with no way to enter her office), not affording her any time to properly turn over her duties as the AFSD-LE (this was done to humiliate Ms. Hightower and hurt her reputation), threatening her with being relieved of duty again if she did not sign a duty agreement (Ms. Hightower on the same day had already signed a duty agreement with her new first line supervisor, ASAC DeCicco), calling her into his office to berate and continue to humiliate her over signing the duty agreement, keeping constant surveillance on her (although he was not her supervisor and he did not monitor the male co-workers), creating conflict over her leaving her office to walk across the street and work on an EEO case with the Office of Chief Counsel, causing her to call in sick after berating her for leaving the building to work with the OCC (Ms. Hightower was further embarrassed as she was instructed to not leave the building in the future without asking permission. No male co-workers were required to ask

permission to leave the building, including two who were on duty agreements), constantly monitoring her work and standing outside her door to listen to her phone calls (no male co-workers were subjected to this surveillance), continuously entering her office and interrupting her in mid-conversation while on the phone to shake his finger in a "no, no" motion at her (insinuating she was doing something wrong by speaking on the telephone), creating such an unbearable, hostile environment for the her that she applied for reassignment to another position in Virginia to get away from him (she had no family, no friends, no contacts in Virginia), making hostile comments to her after one of her subordinates attempted suicide (Example: "You better be glad she did not shoot herself". The subordinate had sliced her wrist and did not use her service weapon), making disparaging gender based comments calling her an "Official Babysitter" in the hallway for employees to hear, announcing in staff meetings that Ms. Hightower had a "condition" that prevented her from being the Duty Agent and was assigned to the field office only (this was done in front of her male co-workers to make the appearance she could not help with the work load. ASAC Cook never did this to the male supervisors), removing her from her office to a non-supervisory cubicle away from all the male supervisors for not retaliating against an employee (this was done to put Ms. Hightower on display for non-supervisory employees to view. No male supervisor's had ever been assigned to the cubicle area), belittling her over her selection in the ASAC position, personally removing her ASAC title from her email account (although ASAC Cook was not her direct supervisor), continuously injecting himself into her work space, making disparaging comments to her that she was inexperienced (suggesting he could teach her something), standing outside of her office making offensive comments such as "People who speak to them are pieces of shit", regarding to DHS Office of Inspection General's Agents who were in the Orlando Office for the Jeopardy Board

(referring to Ms. Hightower who was ordered to give a statement to DHS OIG), denying her the opportunity to attend her dead subordinate's funeral in Louisiana (then approving himself and several male employees to attend), continuous harassing phone calls, inserting himself into her medical issues with Headquarters and not including her direct supervisor, inciting verbal altercations between her and subordinate employees for his amusement, physically battering her in front of a female subordinate during Director Robert Bray's visit to the Orlando Field Office, and discussing ASAC Cook's acts of sexual harassment on her with a male subordinate.

57. In addition to the foregoing, in June 2012, while Ms. Hightower was giving her deposition, an attorney employed by DHS and representing TSA against charges leveled at TSA, himself made disparaging and sexually explicit statements on the record that were directed to such issues as whether Ms. Hightower had undergone breast augmentation, whether Ms. Hightower walked around the Orlando office showing cleavage, and other sexually charged statements and questions.

58. Furthermore, on that same date, in June 2012, Ms. Hightower was interrupted on at least two occasions while conferring with her personal counsel and threatened to hold her in an AWOL position if she did not return immediately, first to her supervisor and then to her the attorney.

59. As a direct, natural, proximate and foreseeable result of the many unlawful acts and omissions of the Defendant, Ms. Hightower has suffered and will continue to suffer pecuniary losses, pre-judgment losses, emotional pain, suffering, inconvenience, humiliation, mental anguish, loss of enjoyment of life, loss of dignity, and other non-pecuniary losses and intangible injuries for which she is entitled as to compensation, as well attorneys' fees and other appropriate remedies.

## COUNT I

## TITLE VII VIOLATION
## GENDER DISCRIMNATION (DISPARATE TREATMENT)

60. Plaintiff reincorporates paragraphs 1 through 59 as alleged herein and further states as follows:

61. Plaintiff is a member of a protected class in that Plaintiff is a female.

62. Plaintiff was qualified for the job she held.

63. Defendant took adverse employment action against her; and

64. Defendant's adverse action against the Plaintiff was based on her protected status.

65. As a direct and proximate result of the discrimination to which Plaintiff was subjected by Defendant, she has suffered and will continue to suffer pecuniary losses, emotional pain, suffering, inconvenience, humiliation, mental anguish, loss of enjoyment of life, loss of dignity, and other non-pecuniary losses and intangible injuries for which she is entitled to compensation.

WHEREFORE Plaintiff prays for the following relief:

(a) A judgment declaring and finding that Defendant's actions, practices and procedures as stated above constitute illegal discrimination in violation of Plaintiff's rights as secured by The Civil Rights Act of 1964, as amended;

(b) Back pay and front pay for a reasonable period of time;

(c) Compensatory damages in an amount to be determined at trial together with punitive damages;

(d) Costs of this lawsuit, together with reasonable attorney and expert witness fees;

(e) Prejudgment interest, as allowed by law, and post-judgment interest; and

(f) Attorneys' fees and costs; and,

(g) Such additional relief as may be just and proper to fully return her to the status she would have enjoyed but for the discriminatory animus of the Defendant.

## COUNT II

## RETALIATION

60. Plaintiff reincorporates paragraphs 1 through 57 as alleged herein and further states as follows:

61. Plaintiff engaged in statutorily protected expression and activities.

62. Plaintiff suffered an adverse employment action.

63. The adverse action was causally related to Plaintiff's protected activities of the Plaintiff and also the retaliatory actions taken by the Defendant.

64. As a direct and proximate result of the retaliation to which Plaintiff was subjected by Defendant, she has suffered and will continue to suffer pecuniary losses, emotional pain, suffering, inconvenience, humiliation, mental anguish, loss of enjoyment of life, loss of dignity, and other non-pecuniary losses and intangible injuries for which she is entitled to compensation.

WHEREFORE Plaintiff prays for the following relief:

(a) A judgment declaring and finding that Defendant's actions, practices and procedures as stated above constitute illegal discrimination in violation of Plaintiff's rights as secured by The Civil Rights Act of 1964, as amended;

(b) Back pay and front pay for a reasonable period of time;

(c) Compensatory damages in an amount to be determined at trial together with punitive damages;

(d) Costs of this lawsuit, together with reasonable attorney and expert witness fees;

(e) Prejudgment interest, as allowed by law, and post-judgment interest; and

(f) Attorneys' fees and costs; and,

(g) Such additional relief as may be just and proper to fully return her to the status she would have enjoyed but for the discriminatory animus of the Defendant.

**COUNT III**

**TITLE VII VIOLATION – HARASSMENT**
**(HOSTILE WORK ENVIRONMENT)**

65. Plaintiff reincorporates paragraphs 1 through 59 as alleged herein and further states as follows:

66. Ms. Hightower is a member of a protected group.

67. She was subjected to unwelcome sexual harassment and a hostile work environment from at least 2009 through 2012.

68. Another motivating factor for the harm that has been caused to the Plaintiff was the harassment that occurred because of Plaintiff's gender.

69. The harassment and hostile work environment and retaliation were sufficiently severe and pervasive as to alter the terms and conditions of Plaintiff's employment.

70. The Defendant knew or should have known of the harassment and failed to take corrective action.

71. As a direct and proximate result of the harassment to which Plaintiff was subjected by Defendant, she has suffered and will continue to suffer pecuniary losses, emotional pain, suffering, inconvenience, humiliation, mental anguish, loss of enjoyment of life, loss of

dignity, and other non-pecuniary losses and intangible injuries for which she is entitled to compensation.

WHEREFORE Plaintiff prays for the following relief:

(a) Assume jurisdiction of this cause of action and the parties;

(b) Issue a judgment declaring and finding that Defendant's actions, practices and procedures as stated above constitute discrimination in violation of Plaintiff's rights as secured by The Civil Rights Act of 1964, as amended;

(c) Order Defendant to make Plaintiff whole, as she was adversely affected by the activities described herein, by providing appropriate back pay, front pay, punitive damages and compensatory damages;

(d) Enter an award and judgment for attorneys' fees and costs; and,

(e) Grant Plaintiff such additional relief as may be just and proper to fully return her to the status she would have enjoyed but for the discriminatory animus and retaliatory conduct of the Defendant.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands trial by jury on all issues so triable.

DATED this 3rd day of April 2014.

Respectfully submitted,

BERNARD H. DEMPSEY, JR.
Florida Bar No.: 107697
Dempsey & Associates, P.A.
Mercantile Bank Plaza - Suite 200
1560 Orange Avenue
Winter Park, Florida 32789
Telephone: (407) 422-5166
Facsimile: (407) 422-8556
Attorney for Plaintiff